**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| Calvin R. Pettrey, and | ) | CASE NO. 1:05-cv-1504 |
| Nikki Pettrey | ) | |
| | ) | |
| Plaintiffs, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Enterprise Title Agency, Inc., | ) | |
| First USA Title Agency, LP, | ) | <u>Memorandum Opinion and Order</u> |
| John DeSantis, and | ) | |
| John Doe(s) | ) | |
| | ) | |
| Defendants. | ) | |


<u>**INTRODUCTION**</u>

Plaintiffs Calvin and Nikki Pettrey have filed a Motion for Certification of the Class (Doc. 57).  This case arises from Enterprise Title Agency, Inc. ("Enterprise") and John DeSantis allegedly setting up sham companies such as First USA Title Agency, LP ("First USA") to cover up the improper payment of referral fees to DeSantis.  For the reasons that follow, the motion is DENIED.

1

## BACKGROUND

Plaintiffs allege the following in their Complaint.  Plaintiffs seek to represent a class of homeowners against Enterprise, DeSantis and First USA (collectively "Defendants").  As will be discussed in more detail below, providers of settlement services (such as Enterprise) are generally forbidden from paying referral fees to real estate agents (such as DeSantis).  Enterprise attempted to evade these restrictions by entering into joint ventures or partnerships (such as First USA) with real estate agents.  These joint ventures or partnerships allowed real estate agents to earn referral fees under the guise of a return on investment.  Plaintiffs allege that First USA and nonparties North American Title Agency, LP, and White Star Title Agency, LP, all operated as such entities.

These entities purported to operate as affiliated business arrangements ("ABAs").  ABAs are supposed to be legitimate business entities performing *bona fide* title and closing services. However, the entities created by Enterprise earned fees despite allegedly performing little or no work in connection with the transactions.  These fees were in addition to the customary and usual fee that Enterprise charged for title and closing work and were channeled back to DeSantis. This allowed DeSantis to pocket additional money and increased the borrowers' closing costs.

First USA and similar entities were identified as receiving fees for title and settlement services on borrowers' HUD-1 Settlement Statements.  However, these entities performed little or no work and the work was in fact performed by Enterprise.  Moreover, First USA and similar entities: 1) perform little or no work and provide no services that Enterprise does not otherwise provide in the course of closing a mortgage loan; 2) are inadequately capitalized; 3) do not have their own employees but utilize "loaned employees" or independent contractors; 4) do not

2

manage their own business affairs; 5) do not market their services competitively; 6) do not have separate offices or business locations, but operate out of Enterprise's offices; 7) contract out most or all of the work or services for which they are hired; 8) do not compete in the marketplace; and 9) were formed solely to facilitate illegal payments and kickbacks by co-conspirator Enterprise to reward Mr. DeSantis and others for having referred the mortgage title and closing work to Enterprise in the first place.

The HUD-1 Settlement Statement ostensibly provides the borrower with information regarding the relationship between First USA and Enterprise. However, the information on the Statement is misleading in that it gives the borrower false assurance that First USA and similar entities are in fact providing necessary, legal and legitimate title services. The Statement conceals the true nature of the corporate relationship, the cost of services and the services performed. It also conceals that DeSantis would be paid a referral fee or kickback in violation of sections 8(a) and 8(b) of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2607. Thus, the borrowers eventually closed on the real estate transactions, paid excessive fees to First USA and similar entities, which were then channeled to DeSantis to reward him for referring the closing and settlement work to Enterprise.

As for the named Plaintiffs, the Complaint alleges the following. DeSantis was the real estate agent for their purchase of a home. He told Plaintiffs that the sellers required the closing to be through Enterprise and told the sellers that Plaintiffs wanted to close with Enterprise. Only at the closing did Plaintiffs become aware that Enterprise and DeSantis were owners of First USA. The HUD-1 Settlement Statement for Plaintiffs' loan listed First USA as providing a number of settlement services. The Statement was prepared by Enterprise to give Plaintiffs false

assurances that First USA was providing necessary, legal and legitimate title services.  The

Statement concealed from Plaintiffs the true nature of the relationship between the conspirators,

concealed the bogus payments, and concealed that First USA was performing no services.  The

work was in fact performed by Enterprise.  It also concealed that DeSantis would be paid a

referral or split-fee.  Plaintiffs further claim that "[i]n connection with the activities giving rise to

this action, the Defendants acted with malice, intent and knowledge, and with a wanton disregard

for the rights of Plaintiffs and other borrowers."

Plaintiffs seek to represent a class consisting of:

All borrowers who entered into mortgage loan transactions using the services of
Enterprise where the HUD-1 Settlement Statement, or other document in the loan
file, include a charge for or payment allocable to an affiliated business
arrangement or entity.

Plaintiffs bring claims for Violation of the Real Estate Settlement Procedures Act

("RESPA"), 12 U.S.C. § 2607 (Count I), Negligent Misrepresentation (Count II), Violation of

the Consumer Sales Protection Act ("CSPA") (Count III) and Civil Conspiracy (Count IV).

The RESPA claim alleges that Defendants provided settlement services for more than

100 "'federally related mortgage loans' as that phrase is defined by RESPA at 12 U.S.C. §

2602(a) and at 24 C.F.R. § 3500.2(3)" for each of the last three years.  DeSantis was a "'real

estate agent' as that phrase is defined by Regulation X at 24 C.F.R. § 3500.2" and provided "real

estate 'settlement services' as that phrase is defined by RESPA at 12 U.S.C. § 2602(3) and 24

C.F.R. § 3500.2."  The payments to First USA and similar entities "constituted a violation of §

8(a) of RESPA, 12 U.S.C. § 2607(a), which prohibits the payment of referral fees or kickbacks

in connection with the origination of federally-related mortgage loans" and "§8(b) of RESPA, 12

U.S.C. § 2607(b), which prohibits the splitting of fees in connection with the origination of

4

federally-related mortgage loans."

The Negligent Misrepresentation claim alleges that Defendants negligently and recklessly made false and misleading representations and omissions "regarding the terms and conditions applicable to Plaintiffs' title and settlement services, intending that Plaintiffs reasonably rely upon the false and misleading representations and omissions to their detriment, which they did."  Plaintiffs contracted for title and settlement services as a direct result of these representations.  Plaintiffs also allege that Defendants owed a duty of care that was breached by making false representations and concealing material facts.  Plaintiffs relied on these representations and omissions in taking actions to their detriment.

With respect to the CSPA claim, Plaintiffs allege that the transaction was a consumer transaction and that Defendants were a supplier.  Defendants violated the CSPA in the following ways: 1) concealing the arrangement between them by placing charges in the HUD-1 statement that were in reality illegal kickbacks; 2) inciting, encouraging, aiding and abetting the ABAs' receiving funds that were in reality a referral fee or kickback; 3) requiring that borrowers pay fees to an ABA that performed little or no work; and 4) intentionally and knowingly making the misleading representations and omissions discussed *supra* for the purpose of making and concealing kickbacks and referrals.

Finally, the Civil Conspiracy claim alleges that the Defendants acted with malice and in concert for the purpose of depriving Plaintiffs and class members of their money, property and legal rights.

Plaintiffs seek damages pursuant to § 8(d)(2) of RESPA, 12 U.S.C. § 2607(d)(2), in "an amount equal to three times the amount of any and all payments to the Sham Entities in respect of each mortgage loan, . . . damages in an amount equal to three times their actual damages

5

under the Consumer Sales Practices Act, . . . all other appropriate relief as provided by O.R.C. §

1345.09," punitive damages, "reasonable costs and attorney's fees" and "such other relief as the

Court deems just and proper."

      The parties have also engaged in discovery related to class certification.  Plaintiffs have

received relevant documents and have deposed real estate agents, Enterprise employees and First

USA employees.  From this, Plaintiffs note the following:

-     Enterprise conducted over 1100 transactions with ABAs from 2003 to the date the lawsuit was filed, with First USA handling at least 50 transactions per month.  The ABAs have operated in the same manner during this period.

-     The documents used in Plaintiffs' transactions are standard and typical of the type of transaction that First USA and Enterprise conducted.

-     The title fees charged to potential class members did not vary much from transaction to transaction.

-     Enterprise and all of the ABAs used standardized forms, including ABA disclosure forms, HUD-1 settlement statements, Real Estate Purchase contracts and title insurance commitment forms.  A number of the form documents allowed Enterprise or an ABA to circle a field to indicate the entity conducting the particular transaction.

-     All of the real estate agents participating in the ABAs entered into the same subscription agreement.  At least one agent has admitted that she treated her ABA and Enterprise as a single entity.

-     Most of the ABAs' business originated from member real estate agents.

      Enterprise's president testified that the ABAs were formed to stem a decline in business.

A total of six ABAs were created with membership limited to real estate agents.  The number of

shares a real estate agent could purchase was based in large part on the agent's production for the

last three years.  Shares were priced at a few hundred dollars and agents received a substantial

return on investment despite performing no work for the ABA beyond steering clients to the

ABA.

Enterprise's president was also the "boss" of each ABA. Enterprise employees interfaced with the real estate agents and all ABAs were operated out of Enterprise's offices. ABA employees performed their ABA work in the same office and often at the same desk as their Enterprise work. Employees have shuffled between the ABAs and Enterprise, and their benefits fall under the same programs wherever they work.

Defendants point out the ABAs do perform bona fide services, including title examinations, issuing title commitments, ordering location surveys, removing title encumbrances and issuing title policies. First USA is operated as a limited partnership. ETA East is the general partner and majority owner while 25 limited partners (including DeSantis) own shares. Enterprise has set up three other ABAs—American/White Star Title Agency, LP, Old Reserve Title Agency, LP, and Grand Reserve Title Agency, LP—while nonparty Enterprise-West Title Services, Inc. has set up Custom Title Agency, LP and New Custom Title Agency, LP. Over 100 limited partners have interests in the nonparty ABAs.

Defendants also focus on Plaintiffs' particular transaction. Plaintiffs were the purchasers of property and DeSantis was the sellers' agent. Plaintiffs received a disclosure form explaining DeSantis's interest in First USA and explaining that they were not required to use First USA for their closing. They also signed a Purchase Agreement stating that First USA would provide title insurance and that Enterprise would be the escrow agent. Despite these disclosures, Plaintiffs claim that they were told that the sellers required that First USA would be used and agreed only upon the guarantee that First USA would match any price that could be provided from Commonwealth Title, a company where Nikki Pettrey occasionally worked and which was operated by Mark Sweeney, the husband of Calvin Pettrey's ex-wife. First USA then performed a number of services between the time of the agreement and the closing. At the time of closing,

7

Plaintiffs provided a letter from Commonwealth stating that had they closed with Commonwealth there would have been no fees.  Enterprise responded by offering a $150 discount which was eventually upped to $225 and then $245.

Plaintiffs testified that they felt they "needed an attorney" because they "wanted to go through Commonwealth title because we know Mark.  We were guaranteed a discount."  They admit that this discount would be "unique to [their] transaction" and Sweeney admits that he would have required payment of some charges.

### STANDARD OF REVIEW

"When a person sues or is sued as a representative of a class, the court must—at an early practicable time—determine by order whether to certify the action as a class action."  Fed. R. Civ. P. 23(c)(1)(A).  The party moving for class certification has the burden of proof.  *In re American Medical Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996).  District courts have substantial discretion in determining whether to certify the class.  *Reeb v. Ohio Dept. of Rehabilitation & Correction*, 435 F.3d 639, 643 (6th Cir. 2006).  However, the Court's decision must be based on a "rigorous analysis" of the requirements of Rule 23.  *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982).  Under Rule 23 a plaintiff must satisfy all of the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  Under Rule 23(a), the party seeking class certification must show:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Because Plaintiffs attempt to base class certification on all three of the Rule 23(b) prerequisites, the Court will discuss each subsection of that Rule in detail *infra*.

**DISCUSSION**

Plaintiffs' RESPA Cause of Action

A court's decision whether to certify the class should not be based on its view of the merits of Plaintiffs' underlying claims. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). Nonetheless, the Rule 23 determination cannot be made in a vacuum. The inquiry courts must make "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Falcon*, 457 U.S. at 160 (citations omitted); *Jones v. Allercare, Inc.*, 203 F.R.D. 290, 295 (N.D. Ohio 2001). Accordingly, while the Court should accept as true the allegations of the Complaint, *e.g., Bentley v. Honeywell Int'l Inc.*, 223 F.R.D. 471, 476 (S.D. Ohio 2004), it is also necessary to "probe behind the pleadings." *Falcon*, 457 U.S. at 160; *see also Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974) (noting that "ordinarily the determination should be predicated on more information than the pleadings will provide").

The first order of business is to understand the relevant legal standards for a RESPA claim. Plaintiffs have pleaded three other claims. However, it is clear from Plaintiffs' allegations that each of these claims fails if the RESPA claim fails.[1] These other claims will be addressed in the class certification discussion to the extent they bring into play additional elements that are relevant to class certification.

Plaintiffs' claim is based on Section 8 of RESPA, 12 U.S.C. § 2607, which states a

---

[1]     Plaintiffs have explicitly disavowed all theories of liability other than that First USA was not a legitimate ABA. Any misrepresentation would have to be that First USA was a legitimate ABA. The same is true with respect to the CSPA and civil conspiracy claims.

9

"Prohibition against kickbacks and unearned fees."  Section 8(a) governs "Business referrals" and states that "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."  12 U.S.C. § 2607(a).  Section 8(b) prohibits "Splitting charges" and states that "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed."  Plaintiffs claim that Defendants violate both of these prohibitions.

All parties agree that Enterprise holds out First USA and similar entities as ABAs.  ABAs are explicitly provided for in Section 8(c) of RESPA as something that does *not* run afoul of Section 8(a) or 8(b): "Nothing in this section shall be construed as prohibiting . . . affiliated business arrangements so long as (A) a disclosure is made of the existence of such an arrangement to the person being referred. . . , (B) such person is not required to use any particular provider of settlement services, and (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship . . . ."[2]  An ABA is defined as:

---

[2]    Pursuant to 24 CFR § 3500.15(b)(3)(ii), "A return on an ownership interest does not include: (A) Any payment which has as a basis of calculation no apparent business motive other than distinguishing among recipients of payments on the basis of the amount of their actual, estimated or anticipated referrals; (B) Any payment which varies according to the relative amount of referrals by the different recipients of similar payments; or (C) A payment based on an ownership, partnership or joint venture share which has been adjusted on the basis of previous relative referrals by recipients of similar payments."

10

an arrangement in which (A) a person who is in a position to refer business incident to or a part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider.

12 U.S.C. § 2602(7).

In addition to the three requirements for an ABA set out in Section 8(c), the Department of Housing and Urban Development ("HUD") has explained that the definition of an ABA as a "provider of settlement services" implies a further prohibition on "shell entities or sham arrangements that are not a bona fide 'provider of settlement services.'"[3]  61 Fed. Reg. 29,258 (June 7, 1996); *see also Gardner v. First American Title Ins. Co.*, 296 F. Supp. 2d 1011, 1017 (D. Minn. 2003) (describing the four-part test for ABAs).  HUD has set forth that one should "consider the following factors and . . . weigh them in light of the specific facts in determining whether an entity is a bona fide provider:"

(1) Does the new entity have sufficient capital and net worth, typical in the industry to conduct the settlement service business for which it was created?  Or is it undercapitalized to do the work it purports to provide?

(2) Is the new entity staffed with its own employees to perform the services it provides?  Or does the new entity have "loaned" employees of one of the parent providers?

---

[3]    This Statement of Policy imbues with the force of federal regulations.  24 CFR § 3500.4(a)(1)(ii); *Culpepper v. Irwin Mortg. Corp.*, 253 F.3d 1324, 1327 (11th Cir. 2001).  An agency's implementation of a statutory provision controls unless it is arbitrary, capricious or manifestly contrary to the statute.  *United States v. Mead*, 533 U.S. 218, 226-27 (2001); *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 844 (1984).  Defendants do not challenge the Statement of Policy on *Chevron* grounds here.

11

(3) Does the new entity manage its own business affairs?  Or is an entity that helped create the new entity running the new entity for the parent provider making the referrals?

(4) Does the new entity have an office for business which is separate from one of the parent providers?  If the new entity is located at the same business address as one of the parent providers, does the new entity pay a general market value rent for the facilities actually furnished?

(5) Is the new entity providing substantial services, i.e., the essential functions of the real estate settlement service, for which the entity receives a fee? Does it incur the risks and receive the rewards of any comparable enterprise operating in the market place?

(6) Does the new entity perform all of the substantial services itself?  Or does it contract out part of the work?  If so, how much is contracted out?

(7) If the new entity contracts out some of its essential functions, does it contract services from an independent third party?  Or are the services contracted from a parent, affiliated provider or an entity that helped create the controlled entity?  If the new entity contracts out work to a parent, affiliated provider or an entity that helped create it does the new entity provide any functions that are of value to the settlement process?

(8) If the new entity contracts out work to another party, is the party performing any contracted services receiving a payment for services and facilities provided that bears a reasonable relationship to the value of the services or goods received? Or is the contractor providing services or goods at a charge such that the new entity is receiving a "thing of value" for referring settlement service business to the party performing the service?

(9) Is the new entity actively competing in the market place for business?  Does the new entity receive or attempt to obtain business from settlement service providers other than the settlement service providers that created the new entity?

(10) Is the new entity sending business exclusively to one of the settlement service providers that created it (such as the title application for a title policy to a title insurance underwriter or a loan package to a lender)?  Or does the new entity send business to a number of entities, which may include one of the providers that created it?

*Id.*; *see also Gardner*, 296 F. Supp. 2d at 1017 n.6.

Plaintiffs assert that they can prove their RESPA claim solely by proving that the ABAs

12

are not "providers of settlement services" under HUD's 10-factor test.  This is clearly the gravamen of the Complaint, which includes allegations that roughly align with the HUD test. Other evidence submitted to the Court by Plaintiffs is similarly calculated to prove liability under this test.

Sections 8(a) and 8(b) prohibit certain conduct, while Section 8(c) provides for safe harbors.  The safe harbor of Section 8(c)(4), which provides for ABAs, is necessary precisely because ABAs are by their nature likely to fall under the sweeping language of Sections 8(a) and 8(b).  Even allowable ABAs are arrangements whereby business is referred to a provider of settlement services and the referring party receives income from the provider.  It follows that a purported ABA that fails to meet the statutory requirements for an ABA violates Section 8.  This conclusion is supported by Section 8(d)(3), which provides that "[n]o person or persons shall be liable for a violation of the provisions of subsection (c)(4)(A)" regarding disclosure of the ABA relationship if certain requirements are met.  12 U.S.C. § 2607(d)(3).  The converse is that the statutory ABA requirements can be "violated" such that a person is "liable."  HUD regulations are to the same effect.  They explain that "[a]n affiliated business arrangement is not a violation of Section 8 of RESPA" only if the ABA requirements are met.  24 CFR §3500.15(b).

Indeed, while Defendants argue against Plaintiffs' sham ABA theory, they point to the other requirements for an ABA.  (Doc. 91 p. 9).  The problem with this argument is that all four ABA requirements—disclosure, choice of service provider, ownership interest, and bona fide service provider—must be met in order to qualify as an ABA.  The failure to meet any one of these requirements is a violation for which a person can be held liable.  *See* 24 CFR §3500.15(b) (stating that all of the requirements must be met to find that "[a]n affiliated business arrangement is not a violation of Section 8 of RESPA"); 61 Fed. Reg. 29,258 (explaining that even a bona

13

fide provider must meet the other three requirements for an ABA).  Plaintiffs' Complaint clearly focuses on the bona fide services provider or sham ABA theory.  In sum, Plaintiffs are correct that they can prove their RESPA claim by proving the ABAs are sham entities.[4]  *See Gardner*, 296 F. Supp. 2d at 1017 (explaining that the failure of an alleged ABA to "meet any one of these requirements is sufficient to establish a RESPA violation").

The Court wishes to be clear that the sham ABA analysis need only be performed on an entity-by-entity basis.  Defendants point to a number of RESPA cases where courts found that liability would have to be determined on a transaction-by-transaction basis.  *E.g., Bjustrom v. Trust One Mortgage Corp.*, 322 F.3d 1201 (9th Cir. 2003); *O'Sullivan v. Countrywide Home Loans*, 319 F.3d 732 (5th Cir. 2003); *Heimmermann v. First Union Mortgage Corp.*, 305 F.3d 1257 (11th Cir. 2002).  Most of these cases involved yield spread premiums ("YSPs") under

---

[4]        A good argument can be made that a plaintiff must prove that there was an actual referral to the sham ABA for there to be a violation of Section 8(a).  Section 8(a) only prohibits referrals, and there is some support for this proposition in the caselaw and administrative materials.  *See Gardner v. First Am. Title Ins. Co.*, No. 00-2176, 2003 U.S. Dist. LEXIS 1815, *20-21 (D. Minn. Jan. 27, 2003); 61 Fed. Reg. 29,258 (June 7, 1996) (explaining that "[i]f an entity does not meet the conditions of the [ABA] exception, then any payments given or accepted in the arrangement may be subject to further analysis under Section 8(a) and 8(b)").  The Court nonetheless disagrees.  The purpose of a sham ABA is to evade Sections 8(a) and 8(b).  If the ABA is found to be a sham, there can be little doubt that the real estate agent (in this case) is receiving a split charge without performing any services under Section 8(b).  Morever, a sham ABA is generally a conduit to pay referral fees, even if a particular customer was not referred.  That customer's fees are nonetheless used as compensation for other referrals under Section 8(a).

14

Section 8.[5]  *Bjustrom*, 322 F.3d at 1204; *Heimmermann*, 305 F.3d at 1263.  Like ABAs, YSPs are not *per se* illegal.  *Bjustrom*, 322 F.3d at 1208; *Marinaccio v. Barnett Banks, Inc.*, 176 F.R.D. 104, 107 (S.D.N.Y. 1997).  A YSP is an interest rate premium that is applied to a particular loan. Because a different YSP applies to each loan, each loan must be considered individually.[6] *Bjustrom*, 322 F.3d at 1208; *Heimmermann*, 305 F.3d at 1264.  Courts thus hold that a "pattern of practice" involving YSPs cannot prove a discrete RESPA violation.  *Hyderi v. Washington Mut. Bank, FA*, 235 F.R.D. 390, 400 (N.D. Ill. 2006).  In contrast, the 10-part test for sham ABAs explicitly looks to general business practices as opposed to individual transactions. Defendants' reliance on YSP cases is therefore unavailing.[7]

Another issue is the measure of damages for a violation.  Sections 8(a) and 8(b) prohibit persons from giving or accepting referral payments or split fees.  Section 8(d)(2) states that "[a]ny person or persons who violate the prohibitions or limitations shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an

---

[5]  One case involved attorneys who were paid for document preparation but would then partially reimburse the mortgage broker for use of its employees' services. *O'Sullivan*, 319 F.3d at 736-37.  Like a YSP, the propriety of a payment was at issue, as opposed to the structure and general function of the entity performing services.  *Id*. at 741.

[6]  Courts once questioned whether YSPs required a transaction-by-transaction analysis.  *See Culpepper v. Irwin Mortgage Corp.*, 253 F.3d 1324, 1331-32 (11th Cir. 2001).  HUD later settled this dispute through a Policy Statement.  *O'Sullivan v. Countrywide Home Loans*, 319 F.3d 732, 740 (5th Cir. 2003).  Notably, HUD's pronouncements with respect to ABAs focus on the entity through the 10-part test outlined above.

[7]  Of course, each ABA must be considered individually.  *Gardner*, 2003 U.S. Dist. LEXIS at *23.

15

amount equal to three times the amount of any charge paid for such settlement service" 12 U.S.C. § 2607(d)(2).  The Court agrees with Plaintiffs that "the amount of any charge paid for such settlement service" includes the full price paid for the settlement service as opposed to the amount of a potential overcharge.

A number of courts have addressed the issue.  Earlier courts tended to limit damages to the amount of an overcharge, thus permitting Section 8 actions only in instances where an overcharge occurred.  *E.g., Durr v. Intercounty Title Co. of Ill.*, 826 F. Supp. 259 (N.D. Ill. 1993); *Morales v. Attorneys' Title Ins. Fund, Inc.*, 983 F. Supp. 1418 (S.D. Fla. 1997); *Moore v. Radian Group, Inc.*, 233 F. Supp. 2d 819 (E.D. Tex. 2002).  More recent courts have rejected these decisions and held that damages for ABA claims include all charges paid to the sham ABA.  The Court agrees with these later decisions.  First, the statute is quite clear.  The language "*any charge paid* for such settlement services" is not at all limiting.  *Robinson v. Fountainhead Title Group Corp.*, 447 F. Supp. 2d 478 (D. Md. 2006); *Kahrer v. Ameriquest Mortgage Co.*, 418 F. Supp. 2d 748, 753 (W.D. Pa. 2006).  This is confirmed by the 1983 Amendments to Section 8, which changed the damages language to its present form.  A review of the previous version of the damage provision demonstrates that Congress knew how to limit damages to an overcharge when it wanted to:

> [A]ny person or persons who violate the provisions of subsection (a) shall be jointly and severally liable to the person or persons whose business has been referred in an amount equal to three times *the value or amount of the fee or thing of value*, and any person or persons who violate the provisions of subsection (b) shall be jointly and severally liable to the person or persons charged for the settlement services involved in an amount equal to *three times the amount of the portion, split or percentage*.

Real Estate Settlement Procedures Act of 1974, Pub. L. No. 93-533, § 8(D)(2), 88 Stat. 1724 (1974) (emphasis added).

16

A major reason for the 1983 Amendments was to address concerns over ABAs.[8]  ABAs were found to impose dangers to consumers and competition in addition to overcharges. *Robinson*, 447 F. Supp. 2d 478; *Kahrer*, 418 F. Supp. 2d at 754.  The House Committee Report explained changes to Section 8(d)(2) (regarding damages) as follows:

> If the persons involved in controlled business arrangements violate the conditions governing such arrangements, they shall be jointly and severally liable to the persons whose settlement service is involved in the amount of three times the amount of the charge paid for the settlement service plus court costs and reasonable attorneys' fees.

H.R. Rep. No. 98-123, 98th Cong., 1st Sess. at p. 77 (1983).  "It would therefore appear that Congress intended not only to create a private right of action but to impose damages based on the amount paid by the consumer and not the amount of the referral payment."[9]  *Kahrer*, 418 F. Supp. 2d at 755; *see also Robinson*, 447 F. Supp. 2d 478.

Although the foregoing discussion does not resolve all relevant RESPA issues, it does provide some context for the Rule 23 class certification discussion that follows.

<u>The Class Definition</u>

Defendants challenge whether the Plaintiffs' class definition is proper.  The party seeking to certify a class must provide a class definition such "[t]hat it is administratively feasible to determine whether a given member is in or out of the class."  *In re Tetracycline Cases*, 107 F.R.D. 719, 728 (W.D. Mich. 1985).  Plaintiffs seek to certify the following class:

---

[8]     ABAs were previously referred to as "controlled business entities" or CBAs.

[9]     This position is also consistent with HUD regulations, which state that "[t]he fact that the transfer of the thing of value does not result in an increase in any charge made by the person giving the thing of value is irrelevant in determining whether the act is prohibited." 24 CFR § 3500.14(g)(2).

17

All borrowers who entered into mortgage loan transactions using the services of Enterprise where the HUD-1 Settlement Statement, or other document in the loan file, include a charge for or payment allocable to an affiliated business arrangement or entity.

Defendants challenge this definition on the following bases: 1) "all borrowers" has no time limitations although RESPA has a one-year statute of limitations; 2) "all borrowers" includes loans and borrowers—e.g., loans that are not federal or residential—that are not covered by RESPA; 3) the Court will be required to examine each "loan file" for a "HUD Settlement Statement or other document" to determine class membership; 4) "payment allocable" cannot form the basis for RESPA liability because under Section 8(d) damages are limited to "any charge paid for such settlement services"; and 5) "affiliated business arrangement or entity" is not defined and the Court should not extend the class action to legitimate ABAs or ABAs that are not parties to this litigation.

Plaintiffs respond with three general arguments.  In response to argument 3, they note that courts often have to look to transactions or documents to determine class membership. Courts will do so as long as class membership can be determined in an objective manner.[10] *Bentley*, 223 F.R.D. at 477; *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability*

---

[10]    The cases cited by Defendants involved a class definition that required courts to perform a subjective or fact-intensive inquiry. *See Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986) (explaining that "the standard of unreasonable delay poses more than merely 'some difficulty' in identifying class members; it poses an insurmountable difficulty"); *Simer v. Rios*, 661 F.2d 655, 670-71 (7th Cir. 1981) (describing a class including those "chilled from applying because of knowledge of this shutoff notice requirement"); *Nicodemus v. Union Pac. Corp.*, 204 F.R.D. 479, 489 (D. Wyo. 2001) (explaining that "the class definition requires this Court to engage in intensive legal investigation because the class is limited to those parcel owners who did not consent to the installation of fiber optic cables").

18

*Litigation*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002); *Garrish v. UAW*, 149 F. Supp. 2d 326, 331

(E.D. Mich. 2001); *Elliott v. ITT Corp.*, 150 F.R.D. 569, 575 (N.D. Ill. 1992).  Here, the Court

agrees that class membership can be determined in a simple, almost mechanical fashion.  There

are six ABAs at issue.  If any one of those ABAs appears in the loan file as receiving a payment,

the borrower on that transaction is a member of the class.

       With respect to argument 5, Plaintiffs disavow that they are attempting to certify a

Defendant class of ABAs and real estate agents.  As the central entity and general partner of

certain ABAs, Enterprise would be jointly and severally liable for all damages.  Although

Defendants claim that the ABAs are necessary and indispensable parties they provide no

authority for this proposition.  Instead, they cite to a case where the plaintiffs sought to certify a

class "notwithstanding that they are not members of the class by virtue of the district court's

summary judgment against them,"  *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498-99 (7th Cir.

1972), and a case where the plaintiffs did not seek damages from a common defendant.

*Thompson v. Board of Educ.*, 709 F.2d 1200, 1205 (6th Cir. 1983).  At least at this point,

Plaintiffs have stated a claim and all potential class members could recover from Enterprise.

       As for arguments 1, 2 and 4, the Court finds that these merits-based arguments are better

addressed in the context of Rule 23(b)(3) (predominance).  If class members must rely on

divergent liability theories or if unique defenses apply to a significant number of class members,

the Court is less likely to certify the class.

<u>Rule 23(a)(1)</u>

       Under Rule 23(a)(1) the Court must determine whether "the class is so numerous that

joinder of all members is impracticable."  "Impracticability of joinder is not determined

according to a strict numerical test but upon the circumstances surrounding the case."  *Senter v.*

*General Motors Corp.*, 532 F.2d 511, 523 (6th Cir. 1976).  Plaintiffs assert that their class

exceeds 1000 members and that courts typically certify a class that exceeds 30 or 40 class

members.  Defendants respond that the Court cannot rely upon Plaintiffs' generalizations

regarding class size.[11]

The Court disagrees.  Plaintiffs have submitted examples that include payments allocated

to ABAs, and testimony that such forms are typical of the 1000+ transactions received  during

discovery from the ABAs.  First USA itself conducts approximately 50 transactions a month.

Based on Plaintiffs sham ABA theory, almost any transaction with the sham entity would be

illegal.  This case is therefore fundamentally different from the cases cited by Defendants.  In

*Fahey v. Encore Financial,* the plaintiff was "aware only of his own specific letter and

conversation."  No. 1:05-cv-1505, 2005 WL 1739323 (N.D. Ohio Oct. 24, 2005).  He

nonetheless relied on "the breadth of Defendants' national network of offices and the dollar

value of their collections activity" to prove numerosity.  *Id.*  In other words, his argument was

that the defendants were a big company so the same thing must have happened to someone else.

Another case cited by Defendants similarly involved a complete lack of evidence that would

impact other class members.  In *Edwards v. McCormick*, the plaintiff argued that others may

have received a collection letter, but provided only conclusory allegations and no other members

of the putative class.  196 F.R.D. 487, 494 (S.D. Ohio 2000).  Here, by contrast, the Court is

---

[11]   Defendants' other argument is that Plaintiffs' claim is actually
       based on the oral promise from DeSantis rather than any sham
       ABAs.  However, the claims in Plaintiffs' Complaint are based on
       sham ABAs, not an oral promise from DeSantis.  To the extent
       Defendants are arguing that Plaintiffs are subject to unique
       defenses, those arguments are best addressed regarding the other
       elements of Rule 23.

confident that the number of class members would reach into the hundreds and that numerosity is satisfied.

Rule 23(a)(2)

The next requirement of Rule 23(a) is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This commonality element does not require class members' claims to be completely identical. Indeed, it is often stated that Rule 23(a)(2) is satisfied so long as there is at least one common issue of law or fact. *American Medical*, 75 F.3d at 1080; *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).

The Court will address each of Plaintiffs' claims separately. With respect to the RESPA claim, the Court agrees with Plaintiffs that common issues of law or fact exist. As the Court discussed *supra*, Plaintiffs' RESPA theory is focused on whether the ABAs are sham entities. Whether they are bona fide service providers is determined on an entity-by-entity basis. Accordingly, there will be common questions of fact and law (e.g., the ten-part HUD test) for all class members who made payments to a particular ABA.[12]

The negligent misrepresentation claim is more challenging. Defendants note that reliance is a necessary element of a negligent misrepresentation claim. *Delman v. Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989). Because reliance must generally be demonstrated on an

---

[12]     Of course, more than one ABA is at issue in this case and Defendants have pleaded a number of defenses. As many courts have acknowledged, the commonality inquiry is often subsumed by the Rule 23(b)(3) predominance inquiry, wherein the Court must weigh the common issues of fact and law against those issues requiring individualized inquiry. *American Medical*, 75 F.3d at 1084. The Court is satisfied in this instance that common issues exist with respect to the RESPA claim adequate to satisfy Rule 23(a)(2).

21

individualized basis, courts often refuse to certify class actions involving misrepresentation or fraud claims. *E.g., Gunnells v. Healthplan Servs.,* 348 F.3d 417, 435 (4th Cir. 2003) (explaining that "the reliance element of fraud and negligent misrepresentation claims [is] not readily susceptible to class-wide proof"); *Andrews v. AT&T,* 95 F.3d 1014 (11th Cir. 1996); *Lichoff v. CSX Transp., Inc.*, No. 3:01-cv-7388, 2004 WL 2280354, *5-6 (N.D. Ohio Oct. 6, 2004). Plaintiffs respond that other courts have allowed class actions to go forward on misrepresentation claims by finding reliance on a class-wide basis. *E.g., Amato v. General Motors Corp.*, 463 N.E.2d 625, 628 (Ohio 1982) (allowing a class action in light "of mass media advertising hype intended to saturate markets with inducements to purchase the heralded product"); *Chisolm v. TranSouth Financial Corp.*, 194 F.R.D. 538 (E.D. Va. 2000) (finding reliance on a class-wide basis where "[t]o conclude otherwise would deny human nature [and] run counter to the traditional presumption in favor of actors operating under rational economic choice"). As Plaintiffs admit, these cases are based on peculiar facts that allowed a presumption of reliance in each case. *See* Doc. 90 at 16 (noting that "presuming reliance is a appropriate *given the facts of that case*")(emphasis in original).

This latter point demonstrates the problem with Plaintiffs' argument. The fact that courts have occasionally allowed litigants to prove reliance on a class-wide basis does not mean that all class actions alleging misrepresentation are entitled to class treatment. Rather, Plaintiffs must explain how they plan to prove reliance in this case. The whole of their explanation is as follows: "Even if reliance is an issue, the fact that each class member paid fees to a sham ABA is evidence that the class member relied on the representation that the sham ABA did the work for which it was paid." However, stating the conclusion does not make it so. Plaintiffs cite no authority that the fact of payment shows reliance in the sham ABA context, nor do they provide

22

any reasoning why purchasers would necessarily rely on the representation that the ABA is performing services.  As the Court noted *supra*, sham ABA claims are unique.  Accordingly, the Court finds that Plaintiffs have failed to meet their burden on the commonality element for the negligent misrepresentation claim.

Defendants also point out that Plaintiffs' CSPA claim cannot be adjudicated on a class-wide basis.  Ohio Revised Code § 1345.09(B) precludes class certification of a CSPA claim unless there is prior notice in the form of "an act or practice determined by a court of this state to violate Section 1345.02 or 1345.03 of the Revised Code and . . . made available for public inspection under division (A)(3) of Section 1345.05" or "an act or practice declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 of the Revised Code" by the Attorney General.  Plaintiffs point to HUD regulations but fail to explain how these qualify under Section 1345.09(B).  Accordingly, the CSPA claim cannot be brought as a class action.[13]

Finally, the parties agree that the conspiracy claim relies on the tort claims.  The Court therefore concludes that common issues do exist only as to RESPA liability.  Plaintiffs' state law claims of negligent misrepresentation and violations of the CSPA bring into play issues that cannot be resolved on a class-wide basis.

Rule 23(a)(3)

Rule 23(a)(3) requires the Court to consider whether "the claims or defenses of the

---

[13]     Moreover, CSPA claims do not apply to real estate transactions. R.C. § 1345.01(A); *Brown v. Liberty Clubs, Inc.*, 543 N.E.2d 783, 786 (Ohio 1989).  Escrow services are a collateral service solely associated with the sale of real estate and are thus considered a pure real estate transaction.  *Hurst v. Enter. Title Agency*, 809 N.E.2d 689, 697 (Ohio App. 2004).

representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

"The commonality and typicality requirements are closely related . . . ."  *Bentley*, 223 F.R.D. at

482 (quoting *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 64 (S.D. Ohio 1991)).  "[A]

plaintiff's claim is typical if it arises from the same event or practice or course of conduct that

gives rise to the claims of other class members, and if his or her claims are based on the same

legal theory."  *American Medical*, 75 F.3d at 1082.  "The premise of the typicality requirement is

simply stated: as goes the claim of the named plaintiff, so go the claims of the class."  *Sprague v.*

*GMC*, 133 F.3d 388, 399 (6th Cir. 1998).

Plaintiffs generally argue that in asserting their claims they will be pursuing the claims of

the class.  They note that Enterprise and the ABAs were operated in a consistent manner and that

their legal issues are the same as those of the class.  Defendants respond that each of Plaintiffs'

claims fails the typicality requirement.  The Court will first address the RESPA claim.

Defendants repeat their arguments that Plaintiffs' claim is really based on DeSantis's oral

promise to match the Commonwealth quote and that the RESPA claim requires a transaction-by-

transaction inquiry.  The Court has already rejected these arguments.  In light of the fact that

RESPA liability can be premised on the failure to operate as a bona fide service provider, and the

present evidence of common practices with Enterprise and the ABAs, the Court agrees that

Plaintiffs are advancing the class claims by advancing their own claims.

The negligent misrepresentation issue is again more challenging.  Defendants correctly

note that a negligent misrepresentation claim consists of multiple elements.  Plaintiffs' only

argument is that proof of a sham ABA "satisfies all the elements of negligent misrepresentation."

This is simply wrong.  Assuming that Plaintiffs can prove their RESPA claim, this would only

satisfy the element of whether false information—that the ABA was a bona fide service

24

provider—was supplied by Defendants.  The Court would still have to consider whether: 1) that information was provided for the guidance of the class members in their business transactions; 2) the class members incurred pecuniary loss; 3) the class members justifiably relied on the false information; and 4) the defendants failed to exercise reasonable care in communicating the information.  *Delman*, 534 N.E.2d at 838.

Not only do these elements require individualized proof, but Plaintiffs have wholly failed to demonstrate that Plaintiffs and other class members are similarly situated with respect to these elements.  Class members may have purchased a property for a residence, for business use or for investment purposes.  They dealt with hundreds of real estate agents who operated under six ABAs who may have taken reasonable care to ascertain that the ABA was proper, even if it ultimately turned out to be a sham ABA.  There is no indication that DeSantis's role in the ABAs was typical.  Unlike the RESPA claims, a negligent misrepresentation claim requires proof of pecuniary loss.  Plaintiffs' claim is not typical in that regard because they were refunded $245 while others' claims are unlikely to involve the unique circumstance of matching the Commonwealth bid.  Even as to reliance, Plaintiffs were arguably uninterested in who performed services, since they relied instead on the promise that Enterprise and First USA would match the bid from Commonwealth.  Accordingly, the Court finds that the Plaintiffs' negligent misrepresentation claim is not typical of the class.

With respect to the CSPA claim, the parties fall back on their commonality arguments. The Court agrees that Plaintiffs cannot bring a CSPA class action.

The parties also agree that the conspiracy claim relies on an underlying tort claim. Because the Court finds that the negligent misrepresentation claim is not typical, it finds that the

conspiracy claim is not typical either.[14]

Rule 23(a)(4)

Rule 23(a)(4) requires that the representative parties will fairly and adequately protect the interests of the class.  This test is met if the representative has common interests with the unnamed members of the class and if the named plaintiffs are represented by experienced and qualified counsel.  *American Medical*, 75 F.3d at 1083; *Senter*, 532 F.2d at 524-25.  Defendants challenge only the "common interests" aspect of the test on the basis that the claims are not typical.  In *American Medical,* the Sixth Circuit described the relationship between typicality and adequacy as follows: "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members."  *American Medical*, 75 F.3d at 1083.  Because the Court finds that the claims are not typical, it also finds that representation is not adequate.

Rule 23(a) – Summary

In sum, the Court finds that only the numerosity element of Rule 23(a) is met.  The commonality element is not met as to two of Plaintiffs' four claims, Plaintiffs' claims are not typical of the class, and the differences between Plaintiffs' claims and the claims of the potential class members preclude Plaintiff from adequately representing class members' interests.  Because Plaintiffs have failed to demonstrate three of the four elements of Rule 23(a), class certification is denied.  The Court will also address Rule 23(b) below.

---

[14]    Defendants also claim that the defenses available are not typical. Although the Court agrees that the typicality of defenses is relevant, Defendants have failed to explain how any particular defense is not typical as applied to the facts and law at issue in this case.

Rule 23(b)(1)

Under Rule 23(b)(1), class certification is appropriate if all four requirements of Rule

23(a) are met and:

> (1) the prosecution of separate actions by or against individual members of the
> class would create a risk of
>     (A) inconsistent or varying adjudications with respect to individual members
> of the class which would establish incompatible standards of conduct for the party
> opposing the class, or
>     (B) adjudications with respect to individual members of the class which would
> as a practical matter be dispositive of the interests of the other members not
> parties to the adjudications or substantially impair or impede their ability to
> protect their interests

Fed. R. Civ. P. 23(b)(1).

"The fact that some plaintiffs may be successful in their suits against a defendant while

others may not is clearly not a ground for invoking Rule 23(b)(1)(A)." *In re Benedictin Prods.*

*Liability Litig.*, 749 F.2d 300, 305 (6th Cir. 1984). The possible precedential effect of individual

actions does not justify certification under Rule 23(b)(1)(A) either. *Bacon v. Honda of Am. Mfg.,*

*Inc.*, 205 F.R.D. 466, 483 (S.D. Ohio 2001). Rather, Rule 23(b)(1)(A) contemplates situations

where conflicting individual adjudications would result in "*different and incompatible*

*affirmative relief*." *See Alexander Grant & Co. v. Gomez*, 116 F.R.D. 583, 589-90 (S.D. Ohio

1987) (quoting *Employers Ins. of Wausau v. FDIC,* 112 F.R.D. 52, 54 (E.D. Tenn. 1986)

(emphasis in original) (discussing the advisory committee notes)). Thus, where class members'

claims rest on divergent factual and legal issues, there is little risk of conflicting individual

adjudications in the first place. *See, e.g., Lichoff*, 218 F.R.D. at 576; *Levels v. Akzo Nobel Salt,*

*Inc.*, 178 F.R.D. 171, 180 (N.D. Ohio 1998). It also follows that Rule 23(b)(1)(A) does not

apply where the "inconsistent result" is merely that some class members will receive damages

while others will not. *Gomez*, 116 F.R.D. at 589; *Employers*, 112 F.R.D. at 54; *see also Zinser v.*

*Accufix Research Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001) ("Certification under Rule 23(b)(1)(A) is therefor not appropriate in an action for damages."); 7AA Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d §1773 p. 13 (Rule 23(b)(1)(A) "requires more than a risk that separate judgments would oblige the opposing party to pay damages to some class members but not to others or pay them different amounts").

Here, the Court has already determined that the negligent misrepresentation, CSPA and conspiracy claims are highly individualized. With respect to the RESPA claim, as will be discussed *infra* with respect to Rule 23(b)(2), Plaintiffs have made no showing whatsoever that inconsistent adjudications would result in anything more than conflicting damage awards. Accordingly, Rule 23(b)(1)(A) does not justify class certification.

Rule 23(b)(1)(B) does not apply to Plaintiffs' proposed class either. The Supreme Court and Sixth Circuit have recently explained that Rule 23(b)(1)(B) is limited to traditional "limited fund" cases in which there is a "fixed fund in the traditional sense: a fixed resource, such as a mineral deposit, or a fixed amount of money, such as a trust." *Telectronics Pacing Sys., Inc. v. TPC Holdings, Inc.*, 221 F.3d 870, 877 (6th Cir. 2000); *see also Ortiz v. Fireboard Corp.*, 527 U.S. 815, 841-42 (1999). Plaintiffs merely assert in conclusory fashion that a damage award will deplete the funds available to other class members. This is exactly the type of claim that the *Ortiz* Court rejected. *Ortiz*, 527 U.S. at 842.

<u>Rule 23(b)(2)</u>

Rule 23(b)(2) permits class certification where Rule 23(a) is met and "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Critical to such a claim is an actual right to injunctive relief.

28

*See Bacon*, 205 F.R.D. at 484 ("Certification of a 23(b)(2) class turns on whether the injunctive and/or declaratory relief sought on behalf of the class predominates relative to any incidental monetary damages requested."). Here, Plaintiffs' Complaint does not even mention injunctive relief. Nor do Plaintiffs attempt to show that they would be entitled to injunctive relief for their claims.

Rule 23(b)(3)

Rule 23(b)(3) permits class certification where Rule 23(a) is met and "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

The Court will first address predominance. This inquiry requires the Court to understand the legal and factual basis for Plaintiffs' claims as well as any affirmative defenses. Although related to commonality, the predominance requirement is far more demanding in that there must not only be common issues but those common issues must predominate over "questions affecting only individual members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

The Court has already addressed Plaintiffs' claims in some detail. From this analysis it is clear that some aspects of the RESPA sham ABA claim will be common to all class members. Most importantly, whether a particular entity is a sham ABA can be decided on an entity-by-entity basis. Although Defendants note that portions of the HUD 10-part test require a "reasonable relationship" or other fact-intensive inquiries, the point is that those inquiries need only be performed once for each ABA. Another aspect of Plaintiffs' claim that is not common, but poses little administrative difficulty, is damages for the RESPA claim. Although these will be different for each class member, damages are based on the total amount paid for the

29

settlement services.

Despite these common aspects of the RESPA claim, the Court finds that individual issues will predominate for the class pleaded by Plaintiffs. The only court to address class certification for a sham ABA claim[15] found predominance to be lacking. *Gardner*, 2003 U.S. Dist. LEXIS 1815, *21-23. That case was admittedly more complex than the case at bar, with 37,000 individual damage claims and 25 ABAs. The *Gardner* Court found "the complexity of computing 37,000 individual damage claims by itself [to be] sufficient grounds for denying class treatment in this matter."[16] *Id.* at 22. It also found that applying "HUD's ten-point analysis . . . [to] each partnership separately" would require the court to "segregate class members' by partnership."[17] *Id.* at 23. Based on these and other factors, the *Gardner* Court concluded that "[w]hile the common issues of fact *do* exist, they are overwhelmed by the complexity and sheer volume of individual issues that predominate this case. Accordingly, the Court concludes with little difficulty that Plaintiffs have not met the predominance factor." *Id.* at 25.

---

[15]    Plaintiffs cite two settlements where a class was certified. However, these decisions discuss predominance in a single conclusory paragraph and are of no practical assistance to the Court.

[16]    The Court does not disagree with Plaintiffs that individualized damage awards do not necessarily preclude a finding of predominance. However, in this case there are many other individual issues in addition to damages.

[17]    Although the parties did not address the issue here, the *Gardner* court also explained that the 10-point test would have to be applied to each ABA with respect to the relevant period for class members' claims. *Gardner*, 2003 U.S. Dist. LEXIS 1815, *23. This might also be true with respect to Plaintiffs' class claims, particularly since Plaintiffs' class definition fails to define a limited time period applicable to class claims.

30

Although the differences between this case and *Gardner* limit its relevance to the case at bar, at least one point is well taken: even a straightforward RESPA sham ABA claim poses some difficulties and significant individualized issues.  This is not a straightforward RESPA case.  As the Court noted *supra* in addressing Plaintiffs' class definition, Plaintiffs have no time limitation even though RESPA has a one-year statute of limitations and their loan definitions includes loans and borrowers that are not covered by RESPA (e.g., loans that are not federal or residential).  Thus, the Court will have to make an individualized inquiry as to the statute of limitations and whether equitable tolling or some other reason to excuse the statute of limitations applies.  The Court will also have to determine on an individual basis whether a particular class member is even covered by RESPA.[18]  Taking these issues in combination with the fact that damages will be determined on an individual basis and that the major common issue (sham ABAs) involves multiple entities, the Court concludes that individualized issues predominate.

The state-law claims also involve predominately individualized issues.  As the Court described in detail *supra*, the only element of the negligent misrepresentation claim that Plaintiffs have demonstrated includes common elements is the existence of a false statement.  Every other element would require individualized proof.  Moreover, the CSPA claim is not amenable to class treatment as a matter of law, and the conspiracy claim, by incorporating the underlying claims, also includes individualized issues.

---

[18]  Plaintiffs argue that defenses do not necessarily destroy predominance. The Court does not disagree.  Rather, in this case the defenses are but one individualized issue among many.  To the extent Plaintiffs argue that the defenses are common to all class members, the Court disagrees.  Plaintiffs' argument to the contrary consists of a conclusory statement without any discussion of the statute or limitations or RESPA coverage issues.

31

In sum, the Court concludes that individualized issues predominate over common issues by a wide margin.  The RESPA claims, though they include some common elements, also involve significant individualized elements.  The state-law claims are highly individualized, and are further complicated by the fact that they are based on an underlying RESPA violation.[19]

With respect to superiority, the Court agrees that a class action is not the superior method to resolve this dispute.  First, the lack of commonality, typicality and predominance all counsel that the litigation would be extremely complicated and difficult to manage.  Moreover, Plaintiffs' claims that litigants lack financial incentives to bring their claims is simply wrong.  Under Section 8(d)(2) plaintiffs can recover their settlement fees and trebled damages.  Under Section 8(d)(5) they are entitled to costs and attorneys' fees.  In addition, HUD, "the Attorney General of any State, or the insurance commissioner of any State may bring an action to enjoin violations of" Section 8.  In light of the incentives for private actions and the possibility of government enforcement, Plaintiffs have failed to demonstrate that a class action is the superior method for resolving this dispute.  *See Gardner*, 2003 U.S. Dist. LEXIS, *26.

---

[19]    Plaintiffs cite a great many unrelated consumer cases, presumably for the proposition that courts often certify consumer class actions.  Defendants cite a great many RESPA cases based on other theories of liability (such as YSP cases), presumably for the proposition that courts often refuse to certify RESPA claims.  Both generalizations miss the point.  The focus is on the particular claims and class at issue.  Absent some explanation of how the cited cases are similar to the case at bar, these authorities are of little assistance.

**CONCLUSION**

For the foregoing reasons, the Court DENIES Plaintiffs' motion.


IT IS SO ORDERED.


/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated:  12/14/06